IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ZACHARY BARKER et al. | : | CIVIL ACTION |
| | : | |
| | v. | : |
| | : | |
| THE BOEING COMPANY | : | No. 12-6684 |

## MEMORANDUM

**L. Felipe Restrepo, J.**                                                                 **May 13, 2014**

Plaintiffs Zachary Barker, Francis X. Boyd Jr., and David W. Smith brought suit against

their former employer, the Boeing Company ("Boeing"), alleging that Boeing terminated their

employment on the basis of their races (Caucasian and Native American) in violation of 42

U.S.C. § 1981.  Boeing counters that it terminated their employment because, while at work,

they posed for a photograph as members of the Ku Klux Klan.  Boeing now moves for summary

judgment in its favor.  For the reasons that follow, I will grant the motion.

### I.       BACKGROUND[1]

On May 3, 2012, Kenta Smith, an African-American aircraft painter employed by Boeing

in its Ridley Park, Pennsylvania facility, reported to his supervisor, Joseph Williams, that he had

recently encountered three of his co-workers dressed as the Ku Klux Klan.  JA 90-91, 119, 513.

He showed Williams a photograph that he had taken with his cell phone.  *See id.*; JA 357, 395.  It

depicts three men, standing in a row and facing the camera, wearing loose, white, robe-like suits

and pointed white hoods.  The hoods cover their faces except for a horizontal oval that exposes

their eyes.  Two of the men are holding makeshift wooden crosses approximately a foot high.

---

[1] Where the record includes conflicting evidence, the facts are presented in the light most favorable to the
plaintiffs, as the summary judgment analysis requires.  *See, e.g.*, *Zimmerman v. Norfolk S. Corp.*, 706
F.3d 170, 176 (3d Cir. 2013).

The men to the center and right are leaning together so that their hoods nearly touch, a cross extended before them.  Ex. A; JA 357, 395.  The picture is very clearly an image of three Klansmen.

It is undisputed that the photograph depicts Barker, Boyd and Smith.  *See* JA 91-95, 112-16, 431.  All three plaintiffs are fair-skinned; Boyd and Smith identify as Caucasian, Barker as Native American.  *See* JA 91-92, 97; Compl. (Doc. 1) ¶ 4.  It is also undisputed that the photo was taken in the Boeing paint shop while the plaintiffs were on the job; that they were wearing company-issued paint suits and "head socks" modified to create a point; and that the crosses were constructed of paint-mixing sticks and duct tape.  *Id.*  Finally, there is absolutely no dispute – nor could there be – that they intended to look like the KKK.  *E.g.* JA 433, 455, 473-75.

According to Williams, Kenta Smith said that he was "unnerved" by the incident but did not want to file a formal complaint.  JA 406, 119.  Nonetheless, Williams reported it to his supervisor, who relayed the information to Boeing's human resources department.  JA 88, 406-07.  Thomas Ceredes, an Equal Employment Opportunity ("EEO") Investigation Officer, launched an investigation, in the course of which he interviewed Williams, Kenta Smith, and the three plaintiffs.  *See* JA 80-125, 481-82.

Kenta Smith told Ceredes that his colleagues had confronted him dressed as members of the KKK and that he had snapped the picture before they could react.  JA 89, 110-11.  He also reported that there had been a noose hanging in the paint shop for some time.  JA 90, 110.  Investigators located the noose dangling from a rafter, as well as a stuffed toy monkey lodged between a beam and a pipe in a different area of the workshop facility.  JA 91, 119, 396-97.

The three plaintiffs told Ceredes that Kenta Smith had engineered the KKK photograph as a joke.  JA 91-94, 112-16.  According to their statements, and their depositions in this case,

Kenta Smith was responsible for an atmosphere of race-based "banter" that pervaded the paint shop:  He joked in racial terms, referred to his colleagues by racial slurs, and alluded to having "the race card" in his wallet.  *Id.*; *see also* JA 430-35, 455-57, 470-75.  On the day the photograph was taken, they contend, Kenta Smith joked that his colleagues looked like the KKK in their paint suits, exhorted them to pose for a picture, and then shaped their hoods into points and provided the crosses in order to make the picture "funnier."  *Id.*  They suspected that he had disclosed the photograph after a falling-out with David Smith, as retaliation.  JA 112, 115, 471.  Another paint-shop employee, Donald Kirby, also contacted Ceredes to volunteer a statement affirming that "[Kenta] Smith refers to white employees as 'honkys' and 'crackers'" and that Baker, Boyd and Smith were "good workers and got caught up in this mess when it was just a joke."  JA at 155.

This was the extent of Ceredes' investigation.  He did not interview any other paint-shop employees about the alleged atmosphere of "racial banter."  JA 484-85.  There is purportedly another painter, Paul Paraka, visible in the background of the picture, but Ceredes did not interview him either.  JA 432-33.  Nor did he interview other employees to whom Kenta Smith had shown the picture.  JA 111, 488-90.

Ceredes compiled the results of his investigation in an "EEO Investigation Report."  JA 88-99.  Weighing the conflicting statements, Ceredes found that Kenta Smith was more credible than Barker, Boyd and Smith, in part because the latter three had not offered many of the details of their story until a second round of interviews, and then had used suspiciously similar phrasing.  JA 95-96.  The report did not mention Kirby.  It concluded that Barker, Boyd and Smith had violated Boeing's "Workplace and Sexual Harassment" policy by "dressing themselves up, and presenting themselves to Smith, as Ku Klux Klan's men [sic] in the workplace, which is

unacceptable and racial in nature." JA at 96. Ceredes sent the report to his manager, Jana

Flessner, and her manager, Alan Scherkenbach; they in turn provided it to Boeing's Director of

EEO Compliance, Ozzie Pierce. JA 482, 495-96, 505-06.

Boeing fired the three plaintiffs very soon thereafter. It is unclear who made the initial

recommendation, *see* JA 486, 497, 506, but Scherkenbach and Pierce approved the termination.

JA 498, 506-511. Each plaintiff received a notice of discharge, dated May 17, 2012 and

effective immediately, that included the following language:

> It has been determined you engaged in inappropriate race-based behavior which is
> unacceptable for the workplace. The company deems your behavior in this matter
> to be in violation of the company's expectations as set form in PRO-4332,
> "Workplace and Sexual Harassment."

JA 100, 103, 106. Kenta Smith was not investigated or disciplined in relation to the incident.

The plaintiffs grieved their termination, initially with the representation of their union,

the UAW Local 1069. In the course of the proceeding the plaintiffs provided statements from

five other employees, who affirmed that the plaintiffs were not racist and that the "rope" hanging

in the paint shop had been there for many years. *See* JA 148-52. Two of the statements, signed

by employees James A. Light and Andrew C. Meier, asserted that Kenta Smith, on the day the

photograph was taken, had asked if they wanted to be "in the family picture," and that

"[e]veryone was just joking and laughing." JA at 150-51.

A Discharge Board of Review meeting regarding Barker's termination was held on June

21, 2012. The Union and Barker argued that the photograph was a joke and that Kenta Smith's

behavior "should mitigate the discipline" for Barker. JA at 167. According to a June 25, 2012

letter from Boeing to the UAW, the Board of Review found the argument unpersuasive:

> During the hearing the Company explained that given the nature and history of
> the Klan (hate-filled rhetoric and violence) and its meaning to African-
> American's [sic] in particular, this behavior, whether in a joking manner or not, is

4

> a clear and significant violation of Company policy and cannot be tolerated . . . .
> There was nothing presented at the hearing to convince the Company the grievant
> was not a willing and active participant in dressing as a Klansman and allowing
> himself to be photographed.  Based on the evidence, the only appropriate outcome
> is to uphold the discharge of Mr. Barker and deny the grievance.

JA at 167.  It is unclear from the record whether similar hearings were held for Smith and Boyd.

In July of 2012, the Union withdrew all three men's grievances.  *See* JA 166, 440, 458.

Barker, Boyd and Smith have now brought suit against Boeing, alleging that it

discriminated against them on the basis of race in violation of 42 U.S.C. § 1981.[2]  Boeing moves

for summary judgment in its favor.

## II.      JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  In ruling on a motion for

summary judgment, a court must "construe the evidence in the light most favorable" to the non-

moving party, *Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 176 (3d Cir. 2013), and grant

summary judgment "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A 'genuine

dispute' exists if a reasonable jury could find for the nonmoving party." *Zimmerman*, 706 F.3d

at 176.  Once the moving party has carried its burden, the non-moving party "must do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  It must, instead, identify

evidence sufficient to support a verdict in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 250 (1986); C. Wright, A. Miller, & M. Kane, 10B Fed. Prac. & Proc. Civ. § 2734 (3d

---

[2] This case was initially filed by Barker alone.  He alleged two counts of discrimination, one on the basis
of his race (Native American) and one on the basis of his perceived race (Caucasian), as well as a cursory
claim of retaliation. *See* Doc. 1.  The perceived-race discrimination claim and retaliation claim have been
dismissed. *See* Doc. 9.  Barker's suit was subsequently consolidated with a separate suit filed by Boyd
and Smith. *See* Doc. 24.

ed.).  "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make

a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).

III.  **DISCUSSION**

A.  **The *McDonnell Douglas* Framework**

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall

have the same right in every State and Territory to make and enforce contracts . . . ."  42 U.S.C.

§ 1981(a).  It has been held to prohibit "discrimination in private employment on the basis of

race," including racial discrimination against white persons.  *McDonald v. Santa Fe Trail*

*Transp. Co.*, 427 U.S. 273, 285 (1976).  "[T]he substantive elements of a claim under section

1981 are generally identical to the elements of an employment discrimination claim under Title

VII."  *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009).  "In the absence of direct

evidence of discrimination," the familiar burden-shifting framework set forth in *McDonnell*

*Douglas Corporation v. Green*, 411 U.S. 792 (1973), applies.  *Anderson v. Wachovia Mort.*

*Corp.*, 621 F.3d 261, 270 (3d Cir. 2010).

To prevail on a claim of race discrimination pursuant to Title VII or § 1981, a plaintiff

must first establish a prima facie case by showing that "s/he suffered an adverse employment

action . . . under circumstances that could give rise to an inference of intentional discrimination"

on the basis of race.  *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008); *see also Iadimarco v.*

*Runyon*, 190 F.3d 151, 163 (3d Cir. 1999) (requiring plaintiffs who allege reverse race

discrimination to present "sufficient evidence to allow a reasonable fact finder to conclude . . .

that the defendant treated [him] less favorably than others because of his race").[3]  The most

common evidence of circumstances suggesting discrimination is evidence of disparate treatment,

"whereby a plaintiff shows that [s/he] was treated less favorably than similarly situated

employees" of a different race.  *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 366 (3d Cir.

2008).

     If the plaintiff makes out the prima facie case, the burden shifts to the defendant "to

articulate some legitimate, nondiscriminatory reason" for the adverse employment action.

*McDonnell Douglas Corp.*, 411 U.S. at 802.  Once the employer does this, the burden "rebounds

to the plaintiff, who must now show by a preponderance of the evidence that the employer's

explanation is pretextual."  *Anderson*, 621 F.3d at 271 (quoting *Fuentes v. Perskie*, 32 F.3d 759,

763 (3d Cir. 1994)).  "[A] plaintiff may defeat a motion for summary judgment by either

discrediting the defendant's proffered reasons or adducing evidence that discrimination was

'more likely than not a determinative cause of the adverse action.'"  *Id.* & n.7 (quoting *Fuentes*,

32 F.3d at 764) (alterations omitted).  "[T]hroughout this burden-shifting paradigm the ultimate

burden of proving intentional discrimination always rests with the plaintiff."  *Fuentes*, 32 F.3d at

763.  The factual question "is whether discriminatory animus motivated the employer, not

whether the employer is wise, shrewd, prudent, or competent."  *Id.* at 765.

---

[3] The complete prima facie case as described in *Makky* has four components:  A plaintiff must show that

    (1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he
    sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the
    action occurred under circumstances that could give rise to an inference of intentional
    discrimination.

541 F.3d at 214.  I omit components (1) and (2) because (2) is not disputed in this case and (1) is not
actually required.  *See Iadimarco*, 190 F.3d at 163; *see also Sarullo v. USPS*, 352 F.3d 789, 798 (3d Cir.
2003) ("The central focus of the prima facie case is always whether the employer is treating some people
less favorably than others because of their race, color, religion, sex, or national origin.") (citation and
internal quotations omitted).

### B.  Analysis

It bears emphasizing, at the start, what the plaintiffs do not contest.  They do not contest

the fact that they posed for a photograph, while on the job, as members of the KKK.  They

acknowledge that a reasonable person could find the image extraordinarily offensive.  They

concede, in fact, that their willing participation in the picture constituted a violation of Boeing's

workplace harassment policy, and that termination was an appropriate sanction.  *See, e.g.*, JA

432, 442, 451, 460, 468, 475-77.  The gist of their complaint is that Kenta Smith was at least as

much to blame as they were, and should have suffered equal consequences.  *Id.*  But because

they are fair-skinned and he is black, they allege, Boeing believed him and not them.  *E.g.* JA

477.  Thus they were fired, and he was not.  The problem with this position is that, even if

accurate, it does not make out a § 1981 claim of intentional race discrimination.

First, with respect to the prima facie case:  The plaintiffs argue that they were "similarly

situated" to Kenta Smith, such that their disparate treatment gives rise to an inference of

discrimination.  He was the instigator; they were hapless participants; he equally culpable.

Accepting the plaintiffs' construction of the facts for purposes of this motion, the argument

ignores several salient differences.  Kenta Smith reported an incident of racial harassment.  The

plaintiffs did not – they were, instead, the object of the report.  The plaintiffs appeared in a

photograph dressed as the KKK.  Kenta Smith did not.

These differences are meaningful.  Whatever Kenta Smith did, he did not appear in that

picture, and because the ultimate question here is a question of Boeing's intent, appearances

matter.  What Boeing confronted, most centrally, was a report of racial harassment and a

photograph of the plaintiffs clad in racial hate-group attire.  It strains credibility, given those

circumstances, for the plaintiffs to argue that they were "similarly situated" to the person who

made the report.[4]  There are no other facts suggesting a "nexus" between the plaintiffs'

termination and animus toward their races.  *Doe*, 527 F.3d at 366.

Even if a jury could somehow find that the evidence met the prima facie threshold, the

plaintiffs' case would falter at the requirement of showing pretext.  It is beyond any doubt that

dressing up as the KKK at work constitutes a legitimate, nondiscriminatory basis for termination.

*See generally Virginia v. Black*, 538 U.S. 343, 352-57 (2003) (chronicling the history of the

KKK's terroristic activity in America).  It therefore falls to the plaintiffs to demonstrate that this

explanation for their firing was pretext, through evidence that "a discriminatory reason more

likely motivated [Boeing] or . . . that [Boeing's] proffered explanation is unworthy of credence."

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

This they cannot do.  There is no evidence that could lead a reasonable jury to conclude

that Boeing did not really fire the plaintiffs for posing as the KKK, or that a more likely cause

was Boeing's animus toward white people.  The plaintiffs argue, variously, that Kenta Smith was

not credible and that Ceredes' investigation was incomplete, but those arguments are beside the

point.  The question is whether Boeing's rationale for firing the plaintiffs – that it believed they

had violated its harassment policy – is a lie, and nothing in the record suggests that it might be.

This is not a case, like *Kowalski v. L & F Products*, 82 F.3d 1283, 1290 (3d Cir. 1996),

where the evidence suggests that the employer's internal investigation might be a cover-up for its

---

[4] Boeing argues that the relevant comparator for Smith and Boyd was Barker, who is Native American but was treated exactly as they were.  According to Boeing, this demonstrates that race was not a factor in the decision-making process.  The argument is not compelling.  Barker is light-skinned, and to the extent that the plaintiffs' claim has any plausibility, it is premised on the fact that Kenta Smith is black and the plaintiffs are not (it is a reverse discrimination claim).  It is irrelevant to that claim that Barker is Native American.

actual motivation in terminating an employee.[5]  The Third Circuit deemed the evidence

sufficient to support a finding of pretext in that case because, among other things, the employer

had never provided the report on which it claimed to have relied.[6]  The plaintiffs in this case do

not contend that Boeing's investigation was launched in bad faith.  They fault Ceredes for failing

to interview available witnesses and omitting Kirby's statement from his report, but those

shortfalls hardly suggest, as in *Kowalski*, that the investigation was a pretense and its conclusions

engineered.  On the contrary:  The plaintiffs concede the necessity of the investigation and its

primary conclusion, which is that they willingly participated in the KKK picture.

Barker also argues that Boeing failed to discipline Sid Powell, an African-American

employee, after a physical altercation with Barker that allegedly involved racial hostility.  *See*

Barker's Resp. (Doc. 34), 10-11.  According to Barker, this shows that Boeing did not

"consistently enforce its [workplace harassment] policies," and therefore that Boeing's "stated

reason for terminating Barker was pretextual."  Doc. 34 at 11.  Neither conclusion follows.  By

Barker's own testimony, the incident with Powell was a physical altercation involving a single

race-inflected insult, and Barker himself did not report it.  JA 435-36, 411-412.  There is no

evidence that the other Boeing witnesses knew that the altercation had any racial content.

Boeing's failure to discipline Powell for a very different and unrelated incident does not show

---

[5] *Kowalski* is an ERISA retaliation case that Boyd and Smith invoke.  The employer in *Kowalski* had purportedly fired the plaintiff for fraudulently claiming medical leave and benefits, and claimed to have relied on an internal investigatory report documenting her fraud.  The plaintiff alleged that she had actually been fired for taking legitimate leave and that the accusation of fraud was a cover-up.  Given that the employer had never offered the investigatory report into the record, the Third Circuit found that there was a genuine factual dispute over whether the employer's proffered reason was the true one.  *Id.* at 1290.  The Court also noted evidence suggesting that there had been no reason for the fraud investigation, that the reasons given had changed over time, and that the report's factual conclusions were highly suspect.  *Id.*

[6] *Id.* ("[W]here the contents of the primary piece of evidence upon which the defendant relies is contradicted by witness testimony and is not even introduced," the Court concluded, "summary judgment is inappropriate.").

inconsistency in enforcement of its harassment policies, let alone such inconsistency as to suggest that Boeing's rationale for the plaintiffs' termination might be pretextual.

In truth, the plaintiffs themselves do not contest the fact that they were fired because of the KKK photograph incident. Their complaint actually seems to be that the severity of the sanction, and the disparate treatment of Kenta Smith, resulted from the races of the employees involved. If this is the plaintiffs' claim, it is really a "mixed-motive" claim. *See Makky*, 541 F.3d at 213 (explaining, in Title VII context, that a plaintiff may prevail under "mixed-motive" theory by showing "that an employment decision was made based on both legitimate and illegitimate reasons"); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). But a mixed-motive theory is not available to the plaintiffs because (1) as they have not presented it, it is waived; and (2) the plaintiffs could not show "by direct evidence that an illegitimate criterion was a substantial factor in the [employment] decision," as a mixed-motive § 1981 claim requires. *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 182 (3d Cir. 2009) (quoting *Price Waterhouse*, 490 U.S. at 276 (O'Connor, J., concurring)); *see also Anderson*, 621 F.3d at 269 (noting that direct-evidence requirement creates a "high hurdle" for plaintiffs).[7]

Finally, it is worth acknowledging the possibility that Boeing did consider the races of Kenta Smith, Barker, Boyd and David Smith in attempting to determine the nature of the KKK photograph incident and the appropriate response. It could hardly do otherwise. And it is certainly possible that the racial alignment of the employees contributed to Ceredes' conclusion that Barker, Boyd and Smith had violated Boeing's harassment policy, or to Boeing's endorsement of a swift and serious sanction. The Ku Klux Klan is a white supremacist

---

[7] *Brown* held that the mixed-motive framework announced in *Price Waterhouse* for Title VII claims is applicable in § 1981 discrimination claims, but that subsequent Congressional amendments to Title VII and the Supreme Court's construction of them in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) and *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179 (2009), are not. *See* 581 F.3d at 182 & n.5; *but see id.* at 185 (Jordan, J., concurring) (expressing qualms about this aspect of the majority opinion).

11

organization that has pursued its agenda through violence and terror largely directed at African-

Americans.  *See Black*, 538 U.S. at 352-57.  In light of that history, it is a simple reality that fair-

skinned men presenting themselves as members of the KKK to a dark-skinned person has a very

particular resonance.  That this may have factored into Boeing's interpretation of the event does

not change the discrimination analysis, under either a pretext or mixed-motive framework.

Boeing fired the plaintiffs for what it deemed a serious act of racial harassment; whether or not

race contributed to that interpretation of the event, and whether or not it was correct, there is no

evidence that Boeing was motivated in any way by "discriminatory animus."  *Fuentes*, 32 F.3d at

765.

IV.     CONCLUSION

Boeing asserts that it fired the plaintiffs because they intentionally posed for a workplace

photograph dressed as the KKK, which violates Boeing policy.  No reasonable jury could find

that this is a pretext, and that Boeing instead fired the plaintiffs because of animus toward

Caucasians and Native Americans.

Summary judgment will be entered in favor of Boeing.  An implementing order follows.